AF Approval _____                                    Chief Approval _CCB_

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                     CASE NO. 8:21-cr-227-SDM-AAS

MARY LOU BJORKMAN

## AMENDED PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Karin

Hoppmann, Acting United States Attorney for the Middle District of Florida, and

the defendant, Mary Lou Bjorkman, and the attorney for the defendant, Bjorn E.

Brunvand, mutually agree as follows:

### A.   Particularized Terms

1.   Count Pleading To

The defendant shall enter a plea of guilty to Count One of the Superseding

Information. Count One charges the defendant with money laundering conspiracy,

in violation of 18 U.S.C. § 1956(h).

2.   Maximum Penalties

Count One carries a maximum sentence of 20-years' imprisonment, a fine of

$500,000 or twice the value of the property involved in the transaction (a financial

transaction will be considered to be one involving the proceeds of a specified

unlawful activity if it is part of a set of parallel or dependent transactions, any of

which involves the proceeds of a specified unlawful activity, and all of which are part

Defendant's Initials _____

of a single plan or arrangement), whichever is greater, a term of supervised release of not more than three years, and a special assessment of $100. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

    3.    <u>Elements of the Offense</u>

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

<u>First</u>:    Two or more people agreed to try to accomplish a common and unlawful plan to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

<u>Second</u>:    the defendant knew about the plan's unlawful purpose and voluntarily joined in it.

    4.    <u>Indictment Waiver</u>

Defendant will waive the right to be charged by way of Indictment before a federal grand jury.

    5.    <u>No Further Charges</u>

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing

Defendant's Initials _MWP_

2

any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, relating to the Newstar Enterprise or the Newstar Websites, as detailed below in Part B.

6.      Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to any victims of the offense in an amount to be determined by the Court at sentencing.

7.      Discretionary Restitution to Victims

Pursuant to 18 U.S.C. § 3663(a) and (b), the defendant agrees to make full restitution to minor victims used by the Newstar Enterprise to create child exploitative material for the Newstar Websites, in an amount to be determined by the Court at sentencing.

8.      Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from

Defendant's Initials _____

the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

9.      Based Offense Level - Joint Recommendation

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree to jointly recommend to the Court that the defendant's Chapter Two based offense level be calculated under U.S.S.G. §2S1.1(a)(2). The parties understand that such a joint recommendation is not binding on the Court, and if not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

10.      Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will not oppose the defendant's request to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including

Defendant's Initials _____

but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

      11.    <u>Cooperation - Substantial Assistance to be Considered</u>

      Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable

Defendant's Initials _____

5

guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below

a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the

cooperation is completed subsequent to sentencing, the government agrees to

consider whether such cooperation qualifies as "substantial assistance" in accordance

with the policy of the United States Attorney for the Middle District of Florida,

warranting the filing of a motion for a reduction of sentence within one year of the

imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the

defendant understands that the determination as to whether "substantial assistance"

has been provided or what type of motion related thereto will be filed, if any, rests

solely with the United States Attorney for the Middle District of Florida, and the

defendant agrees that defendant cannot and will not challenge that determination,

whether by appeal, collateral attack, or otherwise.

     12.    <u>Use of Information - Section 1B1.8</u>

     Pursuant to USSG §1B1.8(a), the United States agrees that no self-

incriminating information which the defendant may provide during the course of

defendant's cooperation and pursuant to this agreement shall be used in determining

the applicable sentencing guideline range, subject to the restrictions and limitations

set forth in USSG §1B1.8(b).

     13.    <u>Cooperation - Responsibilities of Parties</u>

         a.    The government will make known to the Court and other

relevant authorities the nature and extent of defendant's cooperation and any other

Defendant's Initials _mlp_

mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.     It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)     The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)     The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those

Defendant's Initials _mlb_

7

offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)    The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)    The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)    The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set

Defendant's Initials _____

forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

14.     Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982, whether in the possession or control of the United States, the defendant, or defendant's nominees.  The assets to be forfeited specifically include, but are not limited to, the $161,858.00 in proceeds the defendant admits she obtained and laundered as part of the commission of the offense to which the defendant is pleading guilty.

The defendant acknowledges and agrees that (1) the defendant obtained and laundered at least $161,858.00 as part of the commission of the offense and (2) as a result of the acts and omissions of the defendant, the proceeds not recovered by the United States through the forfeiture of the directly traceable assets listed herein have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence.  Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offense of conviction and, further, the defendant consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to

Defendant's Initials

9

the amount of proceeds obtained from commission of the offense(s) and consents to the entry of the forfeiture order into the Treasury Offset Program.   The defendant specifically consents to the forfeiture of the following property as substitute assets in partial satisfaction of the order of forfeiture: approximately $45,780.00 in U.S. Currency and assorted yellow and silver stamped colored metal, seized from 18720 Chopin Drive, Lutz, Florida 33558 on or about November 7, 2019.  The net proceeds from the forfeiture and sale of any specific asset will be credited to and reduce the amount the United States shall be entitled to forfeit as substitute assets pursuant to 21 U.S.C. § 853(p).

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence and the United States shall not be limited to the forfeiture of the substitute assets, if any, specifically listed in this plea agreement.

The defendant agrees and consents to the forfeiture of these assets

Defendant's Initials _____

10

pursuant to any federal criminal, civil, judicial or administrative forfeiture action.

The defendant also agrees to waive all constitutional, statutory and procedural

challenges (including direct appeal, habeas corpus, or any other means) to any

forfeiture carried out in accordance with this Plea Agreement on any grounds,

including that the forfeiture described herein constitutes an excessive fine, was not

properly noticed in the charging instrument, addressed by the Court at the time of

the guilty plea, announced at sentencing, or incorporated into the judgment.

   The defendant admits and agrees that the conduct described in the

Factual Basis below provides a sufficient factual and statutory basis for the forfeiture

of the property sought by the government.  Pursuant to Rule 32.2(b)(4), the

defendant agrees that the preliminary order of forfeiture will satisfy the notice

requirement and will be final as to the defendant at the time it is entered.  In the

event the forfeiture is omitted from the judgment, the defendant agrees that the

forfeiture order may be incorporated into the written judgment at any time pursuant

to Rule 36.

   The defendant agrees to take all steps necessary to identify and locate

all property subject to forfeiture (including substitute assets) and to transfer custody

of such property to the United States before the defendant's sentencing.  To that end,

the defendant agrees to make a full and complete disclosure of all assets over which

defendant exercises control, including all assets held by nominees, to execute any

documents requested by the United States to obtain from any other parties by lawful

Defendant's Initials _____

11

means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may

Defendant's Initials _____

impose upon the defendant in addition to forfeiture.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

   15.    Abandonment of Property - Computer Equipment

The United States of America and defendant hereby agree that any computer equipment as defined in 18 U.S.C. § 2256, seized from the defendant and currently in the custody and/or control of Homeland Security Investigations or other appropriate agency, were properly seized and are subject to forfeiture to the government according to 18 U.S.C. §§ 2253 or 2254, and/or that the computer equipment and peripherals constitute evidence, contraband, or fruits of the crime for which she has pled guilty. As such, defendant hereby relinquishes all claim, title and interest she has in the computer equipment and peripherals to the United States of America with the understanding and consent that the Court, upon approval of this agreement, hereby directs Homeland Security Investigations, or other appropriate agency, to cause the computer equipment described above to be destroyed forthwith without further obligation or duty whatsoever owing to defendant or any other person.

Defendant's Initials _____

13

As part of the plea agreement in this case, defendant hereby states under penalty of perjury that she is the sole and rightful owner of the property, and that defendant hereby intentionally and voluntarily abandons all right and title to and consents to the transfer of title to the United States of America the following property: a MacBook Pro laptop; and iPad Pro; four Amazon tablets; a Canon video recorder DM-12; a Canon XL2 video recorder; a Maxtor External hard drive; a Gateway laptop; an ASUS laptop; an HP Pavillion Q79SL; a Dell laptop; two Toshiba laptops; two HP laptops; a Samsung Galaxy S8 phone; two Samsung Galaxy S5 phones; a Fustisu hard drive; a Samsung phone 5727; an Ibola tablet; a Polaroid handheld video camera; a Kodak digital camera; a video camera tube with SD card; video sunglasses with SD card; a collection of thumb drives; four ZIP drives; 36 floppy disks; four SD cards with an adapter; two Sony mini DV video cassettes; two TDK 8mm video tapes; a Panasonic video tape; four VHS-c tapes; and four Sony mini cassette tapes.

**B.**     **Standard Terms and Conditions**

    1.     <u>Restitution, Special Assessment and Fine</u>

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all

Defendant's Initials _____

counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

2.     Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.     Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

Defendant's Initials _____

15

4.   Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.   Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea

Defendant's Initials _____

16

Agreement, consents to the release of the defendant's tax returns for the previous five

years.  The defendant similarly agrees and authorizes the United States Attorney's

Office to provide to, and obtain from, the United States Probation Office, the

financial affidavit, any of the defendant's federal, state, and local tax returns, bank

records and any other financial information concerning the defendant, for the

purpose of making any recommendations to the Court and for collecting any

assessments, fines, restitution, or forfeiture ordered by the Court.  The defendant

expressly authorizes the United States Attorney's Office to obtain current credit

reports in order to evaluate the defendant's ability to satisfy any financial obligation

imposed by the Court.

     6.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by

this agreement. The Court may accept or reject the agreement, or defer a decision

until it has had an opportunity to consider the presentence report prepared by the

United States Probation Office. The defendant understands and acknowledges that,

although the parties are permitted to make recommendations and present arguments

to the Court, the sentence will be determined solely by the Court, with the assistance

of the United States Probation Office.  Defendant further understands and

acknowledges that any discussions between defendant or defendant's attorney and

the attorney or other agents for the government regarding any recommendations by

the government are not binding on the Court and that, should any recommendations

Defendant's Initials ⟋𝑀𝒱̸

17

be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other

Defendant's Initials _mlb_

18

federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.     Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.     Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and

Defendant's Initials _mw_

19

the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

      11.    <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

<u>FACTS</u>

As further detailed below, from at least as early as August 2018 until November 2019, the defendant, Mary Lou Bjorkman ("Bjorkman"), conspired with other persons to launder proceeds of an enterprise peddling child-pornographic images and videos.

Defendant's Initials _MLb_

Founded on an unknown date but no later than 2005, the Newstar Websites were a collection of websites, hosted on servers in the United States and abroad, that were purportedly dedicated to legal child modeling. But in truth and in fact, the Newstar Websites were designed to and did advertise, sell, distribute, and otherwise make available child pornography and child erotica depicting the supposed child "models." The Newstar Websites were comprised of three subcategories of websites:

a. The Newstar Model Collection, which included over one hundred separate websites hosted at separate URLs. In general, each website was dedicated to a specific brand or line represented by a child-victim. The child-victims depicted on the Newstar Model Collection sites ranged between approximately six to 17-years old. Typically, the child-victim's stage name appeared in each Newstar Model Collection website's name and URL, alongside the words "Newstar," "Tinymodel," or "Sweet." For example, the Newstar Model Collection websites featured lines/brands named "Newstar [C.]," "Sweet [G.]" and "Sweet [L.]." Each Newstar Model Collection site hosted galleries of images of the respective child-victim, some of which depicted minors engaged in sexually explicit conduct. For example, the sites hosted images of child-victims dressed in transparent underwear or sexually suggestive costumes, while exhibiting their clothed genitals and public areas in a lewd and lascivious manner. Images in the Newstar Model Collection websites' galleries were freely available to the public to preview, but greater access and more content required purchasing a monthly subscription. Multiple subscription plans were offered, commonly priced at $49.99 (34 days), $79.99 (60 days), and $99.99 (90 days). The Newstar Model Collection also included a website named "Tiny Model News;" a stand-alone site dedicated to reporting on and advertising content available throughout the Newstar Websites.

b. Clipmonster.net was a stand-alone website that hosted additional content of the child-victims and lines featured on the Newstar Model Collection sites. Clipmonster.net was commonly linked to the various Newstar Model Collection sites through links and advertising banners. Clipmonster.net made available for purchase, à la carte, images and videos of the child-victims, some of which involved minors engaged in sexually explicit conduct.

c. Cyber-pay.net was a payment-processing tool and website used by the Newstar Model Collection sites and by Clipmonster.net to process credit

Defendant's Initials 

21

card and crypto-currency purchases for all content and access sold on those sites.

The Newstar Enterprise was a network of individuals (both United States citizens and foreign nationals) as well as associated corporate entities, fraudulently opened payment processing accounts and bank accounts controlled by those individuals, that sourced, ordered, produced, advertised, sold for profit, and distributed child-exploitative content on the Newstar Websites. Principals of the Newstar Enterprise included Kenneth Power (deceased), who resided in Weston, Florida. Power directed and controlled those functions essential to the operation of the Newstar Enterprise, which operated in the Middle District of Florida and elsewhere. As a principal of the Newstar Enterprise, Kenneth Power acted individually, through his corporate entity, Power Trading Inc. ("Power Trading"), and through bank accounts held by Power Trading. Another Newstar Enterprise principal member was M.R.B. (deceased), who resided in Lutz, Florida, within the Middle District of Florida. M.R.B., among other tasks, maintained web servers essential to the operation of the Newstar Enterprise and facilitated payment processing on behalf of the Newstar Enterprise. M.R.B. acted in his personal capacity, through his corporate entities Bjorkman International, Inc. ("Bjorkman International") and Bjorkman Trans-Tech Inc. ("Bjorkman Trans-Tech"), as well as through bank accounts held by those entities.

The Newstar Enterprise built, maintained, hosted, and operated the Newstar Websites on servers in the United States and abroad. To populate the Newstar

Defendant's Initials _MRB_

22

Websites with content, Newstar Enterprise members sourced, enticed, solicited, and recruited males and females under the age of 18, some of whom were prepubescent, to use as "child models" for the Newstar Websites. Using the recruited child-victims, the Newstar Enterprise produced more than 4.64 million images and videos for use on the Newstar Websites. Some of the produced images and videos depicted minors engaged in sexually explicit conduct in that they depict lewd and lascivious exhibition of the minors' genitals, in violation of 18 U.S.C. § 2251(a) (production of child pornography). For example, the Newstar Websites included the following:

a. The Newstar Websites, Newstar Model Collection, "Sweet [N.]" site; gallery 22, image 18, depicted an 8-to-13-year-old female child-victim lying on the ground and wearing a sleeveless shirt and see-through blue underwear with pink hearts. She stared into the camera with her legs slightly spread. Her underwear was tight enough to ride up into her crotch and the cleft between her labia was visible through her underwear. Other images from the same gallery likewise depicted the female staring into the camera in the same outfit. In these images, she spread her legs for the camera and her genitals were again visible through her underwear.

b. The Newstar Websites, Newstar Model Collection, "Newstar [D.]" site; gallery 278, image 64 depicted a 6-to-9-year-old female child-victim lying on the floor with one hand behind her head. She wore a t-shirt and a frilly skirt. Her shirt exposed her midriff and had been pulled up to expose her pubic area, which was covered in translucent purple underwear with pink hearts. She partially spread her legs and stared directly at the camera. Her pubic area was the focal point of the image. Other images from the same gallery likewise depict the child-victim spreading her legs to expose her underwear beneath her skirt, while staring into the camera.

c. The Newstar Websites, Newstar Model Collection, "Sweet [C.]" site; gallery 21, image 30 depicted a 6-to-9-year-old female child-victim wearing a long gown designed like a police uniform, complete with a badge. She also wore a police cap and had handcuffs in one of her hands. In the image, she leaned back on the floor with one leg extended in the air and her legs spread wide. The gown was fully open from her mid-abdomen down, and her pink and white underwear was fully visible. She stared into

Defendant's Initials 

23

the camera and placed her hand on her underwear near her genital area, which was a clear focal point of the image.

d. The Newstar Websites, Newstar Model Collection "Sweet [G.]" site; gallery 188, image 67 depicted a 6-to-9-year-old female child-victim laying on the floor with her head resting on a cheerleader's pom-pom. She stared into the camera while wearing a red miniskirt and t-shirt that was cut off a few inches below her nipples to expose her stomach and lower rib cage. Her miniskirt was hiked up and her legs spread to expose her genital area, which was covered only by partially transparent underwear.

e. The Newstar Websites, Clipmonster.net page hosted and sold a video file depicting Newstar "model" "Sweet [C.]" (a/k/a "Newstar [D.]"). The video depicted a prepubescent female child-victim striking various poses, touching herself in a sexual manner and playing with her hair for approximately seven-and-a-half minutes while music (electric guitar chords) played. The prepubescent female wore a tight, green bikini-type outfit with a flower design directly next to her vaginal area. She danced around and on top of a beanbag chair. In another video on Clipmonster.net of "Sweet [C.]," the same prepubescent female, wearing a pink tank top and underwear, laid down with her legs spread (one leg flat) on a tiger-fur rug. She had both arms over her head. The outline of her labia was visible protruding through her pink underwear.

f. The Newstar Websites, Clipmonster.net page, hosted and sold another video depicting 6-to-9-year-old child victim "Sweet [C.]." In the video, the child-victim wore a revealing, two-piece garment that left most of her torso and her legs bare. The video captured her gyrating, dancing, and tossing her hair while techno music played in the background. At one point in the video, she knelt on the ground, spread her legs, and briefly thrusted her pelvis. Another video hosted on the site depicted the same child-victim wearing the same revealing outfit. She again danced and tossed her hair, thrusted her pelvis and rubbed her hands against her body in a sexual manner. At one point in the video, she knelt and spread her legs slightly for the camera. At another point, she pulled one strap of her tank top down over her shoulder. The preview image for these two videos depicted the most sexually explicit moments of each video. The first depicted the female kneeling on one knee and leaning back on her hands while spreading her legs. In the second preview image, the girl again knelt on one knee while lifting the other leg into the air, spreading her legs for the camera.

g. The Newstar Websites, Clipmonster.net page hosted and sold a video of "[B.]," a 9-to-13-year-old female child-victim. The video depicted her sitting on a bamboo loveseat. She wore a short, pink tank-top that exposed her midriff and pink underwear. On a least five occasions in the video, she stared into the camera while spreading her legs to expose her clothed pubic

Defendant's Initials _*mlb*_

area. She also rubbed lotion on her legs while the camera zoomed in on her body. At one point, when she knelt on the loveseat, her tight pants show from a distance the cleft between her labia. The preview image for this video depicted the child-victim spreading her legs slightly while sitting on the loveseat and rubbing lotion on one of her legs, inner thigh, and stomach.

Some of the child-victims detailed immediately above—most of whom recruited from Ukraine, Moldova, and other nations in Eastern Europe—were particularly vulnerable due to their age, family dynamics, and/or poverty. Their recruitment and use in the manner detailed above represented an offense against a foreign nation involving the sexual exploitation of children, as contemplated by 18 U.S.C. § 1956(c)(7)(B)(vii).

Members of the Newstar Enterprise curated, hosted, advertised, sold access to, made available and distributed the above-detailed content and many other child-pornographic images and videos on the Newstar Model Collection websites and on Clipmonster.net, in violation of 18 U.S.C. §§ 2251(d) and (e) and 2252(a)(2) and (b)(1). Indeed, as detailed above, a number of the advertisement images, banners, and previews published on the Newstar Websites themselves sometimes displayed minors engaged in sexually explicit conduct. For example, one advertised image available as a "free preview" for non-paying members was a preview photo for a gallery on the Newstar Model Collection website for "Sweet [G.]." It depicted a six to nine-year-old child-victim lying on her stomach while wearing shorts, a sleeveless shirt, and bunny ears. The contours of her buttocks were clearly defined by her tight shorts. She held a jump rope with handles that look like carrots. The photo depicted

Defendant's Initials *mlp*

her opening her mouth and partially inserting one of the carrot handles into it while she stared into the camera. The image was clearly sexual and the carrot handle suggestive of a phallus. In another example, the preview photo for another gallery on the same website depicted a six to nine-year-old child-victim sitting on the floor and reclining back on her hands. She wore a t-shirt that exposed her midriff and a denim skirt. She elevated one of her knees into the air (raising the hem of her skirt) and spread her legs slightly while staring into the camera. Her underwear-covered pubic area was visible under her skirt and was a focal point of the image.

The Newstar Enterprise built, maintained, hosted and used "cyber-pay.net" to process transactions for subscription-memberships or for the purchase of individual images and videos from the Newstar Websites. The Enterprise maintained a membership list for subscribers and customers of the Newstar Websites, who originated from 101 nations across the world. The Newstar Enterprise also screened and verified new members and purchasers. Accepted forms of payment on the Newstar Websites included credit cards and crypto currency.

To process and receive these payments, Newstar Enterprise members opened, under false pretenses, payment processing accounts and associated merchant bank accounts held by Federal Deposit Insurance Corporation-insured ("FDIC-insured") banking institutions, as well as business checking accounts held by FDIC-insured banks. When applying to open these accounts, members of the Newstar Enterprise intentionally provided the payment-processing companies and FDIC-insured banks

Defendant's Initials _MW_

26

with material misrepresentations about the nature of their business and the accounts'

intended use, and did not fully and truthfully disclose the nature of the Newstar

Websites nor the Newstar Enterprise, in violation of 18 U.S.C. § 1344 (bank fraud).

The Newstar Enterprise also opened and used foreign bank accounts.

From approximately 2005 until 2019, the sale of content on the Newstar

Websites generated at least $9,436,928.21 in revenue for the Newstar Enterprise. The

Newstar Enterprise therefore had a constant need—for the purposes of paying

operating costs of the Enterprise and Newstar Websites, to perpetuate their function,

and to distribute their fruits—to transfer and transmit money from payment-

processor merchant accounts to domestic and foreign business and personal bank

accounts.

Use of the national and international banking system also gave rise to a

corresponding need for the Newstar Enterprise to recruit additional members for the

purposes of performing operational tasks for the Enterprise and to further conceal the

nature of the Enterprise in order to ensure continued access to the banking system

and shield principal Enterprise members from criminal exposure and other liability.

Principal members of the Newstar Enterprise thus recruited the defendant,

Bjorkman, who resided in Lutz, Florida, within the Middle District of Florida, to

direct and perform financial functions essential to the continued operation of the

Newstar Enterprise and Newstar Websites. From an unknown date but as early as

August 2018, Bjorkman knowingly and willfully entered into an agreement with

Defendant's Initials _____

Kenneth Power, M.R.B., and other coconspirators associated with the Newstar

Enterprise to fraudulently open payment-processing accounts and FDIC-insured

bank accounts in the United States by misrepresenting the nature and purpose of the

accounts, and to launder proceeds that Bjorkman knew represented proceeds of

felonious unlawful activity. The proceeds were generated from the Newstar

Websites. Bjorkman's agreement entailed receiving those proceeds and routing them

back to principal members of the Newstar Enterprise through the FDIC-insured bank

accounts.

   In furtherance of this conspiracy and intending to conceal and disguise the

nature, location, source, ownership, and control of the Newstar Enterprise's

unlawfully procured monies and ongoing bank fraud, Bjorkman engaged in a series

of acts. For example:

  a. On August 8, 2018, Bjorkman incorporated Hope Trans Tech in the State
     of Florida.
  b. On August 10, 2018, Bjorkman, on behalf of the Newstar Enterprise and
     under false pretense of a jewelry company named "Evil Angel Jewelry"
     that was purportedly engaged in the jewelry business, applied to open and
     opened a merchant processing account at Elavon Inc. ("Elavon").
     Bjorkman opened this account for the purpose of using it as an account
     through which Newstar Enterprise funds could be collected, concealed,
     and transferred back through the Newstar Enterprise.
  c. On August 10, 2018, Bjorkman, on behalf of the Newstar Enterprise and
     through her application to fraudulently open a merchant processing
     account with Elavon, opened a related merchant bank account serviced by
     the FDIC-insured U.S. Bank, NA ("U.S. Bank").
  d. On an unknown date but sometime in 2018, Bjorkman agreed to assist
     Power, M.R.B. and others known and unknown to the United States in
     using her merchant processing account at Elavon (opened in the name of
     "Evil Angel Jewelry") and related merchant bank account at U.S. Bank to
     process payments for purchases made by customers of the Newstar

Defendant's Initials 

28

Websites. At this time, and at all times thereafter, Bjorkman was aware that these payments would be processed in the name of "Evil Angel Jewelry" and would falsely appear to be payments for jewelry, but in truth and in fact they were for other illegal proceeds unrelated to jewelry.

e. On August 10, 2018, Bjorkman, on behalf of the Newstar Enterprise, opened bank account #7922955161 for Hope Trans Tech at an FDIC-insured Fifth/Third Bank branch located in Tampa, Florida, in the Middle District of Florida. Bjorkman opened this account for the purpose of using it as an account through which Newstar Enterprise funds could be collected, concealed, and transferred back through the Newstar Enterprise.

f. On September 17, 2018, Bjorkman, on behalf of the Newstar Enterprise and for the purpose of concealing its felonious unlawful activities, withdrew $800 from account #7922955161 in the name of Hope Trans Tech at Fifth/Third Bank; $500 of which was deposited into bank account #1000016378787 in the name of Bjorkman International at Bank of America, N.A. This money consisted of proceeds from the sale of images and videos on the Newstar Websites. For example, earlier in September 2018, several patrons had purchased subscriptions for access to galleries for the specific Newstar Websites pages for "Sweet [L.]," "Newstar [D.]" and "Sweet [C.]." The purchased galleries contained images depicting minors engaged in sexually explicit conduct, that is, lewd and lascivious exhibition of the child-victims' genitals and pubic areas. Cyber-pay.net routed 15 credit card transactions for these purchases from the Newstar Websites, totaling $795.85, to Bjorkman's "Evil Angel Jewelry" account at merchant processor Elavon. Elavon batched the transactions and deposited the money into Fifth/Third account #7922955161 held by Hope Trans Tech. From there, those funds were routed back through other bank accounts held by Newstar Enterprise members to further the Enterprise's operations.

g. On February 7, 2019, Bjorkman, on behalf of the Newstar Enterprise and for the purpose of concealing its felonious unlawful activities, withdrew $2,600.00 from account #7922955161 in the name of Hope Trans Tech at Fifth/Third Bank and deposited $2,300 into bank account #229011723377 in the name of Bjorkman Trans Tech at Bank of America, NA. This money consisted of proceeds from the sale of images and videos on the Newstar Websites. For example, earlier in February 2019, patrons had purchased subscriptions for access to galleries for the specific Newstar Websites pages for "Sweet [L.]." The purchased galleries contained images depicting minors engaged in sexually explicit conduct, that is, lewd and lascivious exhibition of the child-victim's genitals and pubic area. Cyber-pay.net routed 43 credit card transactions for these purchases from the Newstar Websites, totaling $2,567.57, to Bjorkman's "Evil Angel Jewelry" account at merchant processor Elavon. Elavon batched the transactions and

Defendant's Initials 

deposited the money into Fifth/Third account #7922955161 held by Hope Trans Tech. From there, those funds were routed back through other bank accounts held and utilized by Newstar Enterprise members, including Kenneth Power (Power Trading), P.V., and an entity controlled by D.L., to further the Enterprise's operations.

h. On June 20, 2019, Bjorkman, on behalf of the Newstar Enterprise and for the purpose of concealing its felonious unlawful activities, withdrew $2,600 from account #7922955161 in the name of Hope Trans Tech at Fifth/Third Bank; $2,200 of which was deposited into bank account #229011723377 in the name of Bjorkman Trans Tech at Bank of America, NA. This money consisted of proceeds from the sale of images and videos on the Newstar Websites. For example, earlier in June 2019, several patrons had purchased subscriptions for access to galleries for the specific Newstar Websites pages for "Sweet [L.]," "Sweet [G.]" and "Sweet [A.]." The purchased galleries contained images depicting minors engaged in sexually explicit conduct, that is, lewd and lascivious exhibition of the child-victims' genitals and pubic areas. Cyber-pay.net routed 48 credit card transactions for these purchases from the Newstar Websites, totaling $2,501.52, to Bjorkman's "Evil Angel Jewelry" account at merchant processor Elavon. Elavon batched the transactions and deposited the money into Fifth/Third account #7922955161 held by Hope Trans Tech. From there, those funds were routed back through other bank accounts held by Newstar Enterprise members to further the Enterprise's operations.

In total, Bjorkman, knowing the monies were derived from felonious unlawful activities, caused the receipt and transfer of at least $161,858 for the Newstar Enterprise intending to conceal and disguise the nature, location, source, ownership, and control of the proceeds, as well as to conceal the Enterprise's use of fraudulently opened bank accounts in the United States.

12.   Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other

Defendant's Initials _____

promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

    13.    <u>Certification</u>

    The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

    DATED this ___21st___ day of July, 2021.

KARIN HOPPMANN
Acting United States Attorney


Mary Lou Bjorkman
Defendant


Francis D. Murray
Assistant United States Attorney


Bjorn E. Brunvand
Attorney for the Defendant


Kyle P. Reynolds
Trial Attorney
Department of Justice


Carlton C. Gammons
Assistant United States Attorney
Chief, Special Victims Section


Defendant's Initials _____

31