UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:21-cr-227-SDM-AAS

MARY LOU BJORKMAN

**UNITED STATES' SENTENCING MEMORANDUM**

The United States files this sentencing memorandum requesting that this Court sentence the defendant, Mary Lou Bjorkman, to a low-end guidelines sentence, as set forth below.

## I. Background

This case arose as part of the United States' investigation into the Newstar Enterprise—an internet-based business aimed at for-profit sexual exploitation of vulnerable children. The Enterprise created and operated the Newstar Websites, which were a collection of websites that purported to promote "child modeling," but which in fact sold child pornography and child erotica depicting scantily minors recruited from Moldova, the Czech Republic, and other countries in Eastern Europe. Doc. 13 at 20–30. Between approximately 2005 and 2019, the sale of content over the Newstar Websites generated more than $9.4 million. *Id.* at 27.

In order to keep the Enterprise going and continuing to earn money, its principals—including Kenneth Power and M.R.B., Bjorkman's former husband—needed bank accounts and credit-card merchant accounts to process customer payments and funnel the money to themselves and their coconspirators. But they obviously could

not tell the banks about the true nature or source of the money. So, they recruited others to open accounts under false pretenses and allow the Enterprise to use them.

One such person was Bjorkman. After being recruited by Power and M.R.B., she helped to connect the Newstar Enterprise with seemingly legitimate bank and payment-processing accounts in the United States. She did so by committing fraud. In particular, she opened certain accounts by representing to financial institutions—including FDIC-insured institutions—that the accounts were for the benefit of a jewelry company called "Evil Angel Jewelry." But as Bjorkman well knew, this was a lie and the jewelry company did not exist. Doc. 13 at 28–29. After opening these accounts, Bjorkman allowed money from the Newstar Enterprise to flow through the accounts and assisted with distributing it back to M.R.B., Power, and other Newstar conspirators. In total, she facilitated the receipt and processing of more than $160,000 that originated from customer payments to the Newstar Websites and flowed through her fraudulently acquired accounts to other Newstar conspirators. *Id.* at 29–30.

In committing this financial fraud, Bjorkman facilitated and assisted the Newstar Enterprise and helped perpetuate it. Based on the information available to the United States, it is more likely than not that Bjorkman was unaware of the child-exploitative content available for sale through the Newstar Websites.[1] She unambiguously knew,

[1] The information available to the United States makes it more likely than not that Bjorkman was unaware of the Newstar Websites and their content. This conclusion is supported by three independent reasons. First, the United States has uncovered no evidence during its extensive investigation indicating, even by implication or circumstance, that Bjorkman knew about the child-exploitative content on the Newstar Websites. Second, the investigation uncovered at least one communication between Newstar principals specifically suggesting that Bjorkman was unaware of the Newstar content. In particular, on May 8, 2018, M.R.B. emailed Kenneth Power and said, "Just so you know, ML still doesn't know what you

though, that Evil Angel Jewelry was a sham, that the representations she made to financial institutions were lies, and that the money flowing through the accounts was unrelated to jewelry.

In June 2021, Bjorkman pleaded guilty to a Superseding Information charging her with money laundering conspiracy. Docs. 9, 13, 23, 24. Her sentencing hearing is set for February 17, 2022 at 8:30 a.m. Doc. 44.

## II. Presentence Investigation Report

On February 10, 2022, the U.S. Probation Office issued its Final Presentence Investigation Report (PSR). Doc. 46. The Probation Officer determined that Bjorkman's applicable guidelines range for the underlying offense is 30–37 months' imprisonment, based on an adjusted total-offense level of 19 and a criminal history category of I.[2] PSR ¶89. The applicable period of supervised release is a maximum of three years. PSR ¶91.

The parties have no remaining factual objections to the PSR. This Court should adopt the PSR's facts and guideline calculations.

---

do, so don't let her know. She is not as easy going on that as Mrs. P. ML would probably want an immediate divorce…" "ML" in these emails refers to Mary Lou Bjorkman, and the email expressly contrasts "ML's" knowledge of the Newstar Websites with that of "Mrs. P.," which refers to Patrice Wilowski-Mevorah. Third, Tatiana Power, who laundered money for and played a central role in the Newstar Enterprise, told the United States that her former husband, Kenneth Power, had mentioned that Bjorkman was never told anything about the Enterprise because Power considered her a "drinker" and "trouble maker."

[2] Bjorkman proffered and cooperated with the United States. Accordingly, the government filed a substantial assistance motion under U.S.S.G. §5K1.1, requesting a two-level departure in recognition of Bjorkman's cooperation. Doc. 35.

## III. <u>Argument in support of a guidelines sentence</u>

Bjorkman's conduct, taken with the sentencing factors set forth in 18 U.S.C. § 3553(a), calls for a guidelines sentence. Bjorkman defrauded financial institutions and laundered a large amount of money that benefited an enterprise engaged in sexually exploiting children.

Although this Court may not presume that a guideline-range sentence is reasonable, the guidelines remain a significant and pivotal component of the sentencing process. *United States v. Delva*, 922 F.3d 1228, 1257 (11th Cir. 2019); *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) ("[W]hile we do not presume that a sentence falling within the guidelines range is reasonable, we ordinarily expect it to be so."). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891–92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other

corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Consideration of these factors necessitates a guidelines sentence.

### A. Nature and circumstances of the offense

The seriousness of Bjorkman's conduct demonstrates the necessity of a low-end guidelines sentence. Bjorkman did not suffer from a solitary lapse in judgment. Her conduct was deliberate and premeditated. She appears to have created a Florida corporation, Hope Trans-Tech, Inc., in August 2018, for the express purpose of perpetrating bank fraud and laundering money. Two days later, she lied to financial institutions opening bank and credit-card merchant accounts for a supposed jewelry business.

In particular, Bjorkman applied for a credit-card merchant account with Elavon, Inc., in which she was supposed to provide detailed information about the business using the account. She told Elavon that she was the contact for Home Trans Tech, Inc., which had been established the previous month:

1 COMPANY INFORMATION

♦DBA NAME: HOPE TRANS TECH, INC.

CONTACT NAME: MARYLOU BJORKMAN

♦DBA ADDRESS TYPE: B ♦DBA ADDRESS1 (NO PO BOX) 3959 VAN DYKE RD #285

DBA ADDRESS 2:

♦CITY: LUTZ ♦STATE FL ♦ZIP CODE: 33558

♦COUNTRY OF PRIMARY BUSINESS OPERATIONS: USA

♦BUSINESS COUNTRY OF FORMATION: USA ♦DBA PHONE #: 813-601-2643

♦EMAIL ADDRESS: marylouBJorkman@gmail.com DBA FAX #

YEAR ESTABLISHED: 2018 MOBILE PHONE #: 813-601-2643

♦LENGTH OF CURRENT OWNERSHIP: YEARS, 1 MONTHS

She further told Elavon that she was the 100 percent owner of Hope Trans Tech, that there were no other beneficial owners, and that she was the responsible party:

| 3 | PRINCIPAL 1 INFORMATION (INCLUDE ALL ADDITIONAL OWNERS WITH 25% OR GREATER OWNERSHIP (INDIVIDUAL OR INTERMEDIARY BUSINESS) ON THE ADDL OWNERSHIP FORM) | | |
|---|---|---|---|
| ♦ ☑ BENEFICIAL OWNER: PERCENTAGE OF OWNERSHIP 100% | ☐ AUTHORIZED SIGNER | ☐ SOLE PROPRIETOR | |
| ♦ ADDITIONAL BENEFICIAL OWNERS? | ☐ RESPONSIBLE PARTY | TITLE: OWNER | IF OTHER: |
| ♦ FIRST NAME: MARYLOU | ♦ MIDDLE NAME: | ♦ LAST NAME: BJORKMAN | |
| ♦ ADDRESS TYPE: | ♦ ADDRESS (NO PO BOX): 18720 CHOPIN AVE, LUTZ, FL | | |
| ♦ CITY: LUTZ | ♦ STATE/PROVINCE: FL | ♦ ZIP/POSTAL CODE: 33558 | ♦ COUNTRY: USA |
| ♦ DOB: 06-19-1963 | ♦ US PERSON: YES | | ♦ PHONE #: 813-601-2643 |

She then provided entirely false information about the company that Hope Trans Tech was doing business as, "Evil Angel Jewelry." She claimed that the product offered was "jewelry." She also offered fictional figures for the company's annual revenue, monthly credit card sales, and average purchase.

| OTHER COMPANY INFORMATION | | |
|---|---|---|
| ♦ AVERAGE SALE AMOUNT: $ 60.00 | ☐ CARD PRESENT 100% | OMNI COMMERCE (MUST TOTAL 100%) |
| ♦ HIGH SALE AMOUNT: $ 200.00 | ☐ CARD NOT PRESENT 100%* | CARD PRESENT ___ % |
| ♦ NUMBER OF HIGH SALES (ABOVE) ANNUALLY: 10 | ☑ INTERNET 100%* | CARD NOT PRESENT* 100 % |
| ♦ TOTAL MONTHLY VISA/MC/AMEX/DISC/UNIONPAY SALES: $ 20,000 – | ☐ OMNI COMMERCE | INTERNET* ___ % |
| ♦ ANNUAL REVENUE: $ 300,000 – | ♦ INTERNET: PRODUCT WEBSITE: EVILANGELJEWELRY.COM | |
| ♦ INDUSTRY TYPE: BODY JEWELRY | ♦ INTERNET: "CONTACT US" EMAIL: SUPPORT@EVILANGELJEWELRY.COM | |
| ♦ DESCRIPTION OF PRODUCT/SERVICES OFFERED: " " | *CUSTOMER SERVICE PHONE # AND PREVIOUS PROCESSOR REQUIRED BELOW | |
| SPECIAL PROGRAM MCC ONLY: | ♦ CUSTOMER SERVICE PHONE #: | |
| WHEN DOES THE CUSTOMER RECEIVE THE PRODUCT OR SERVICE? IF NOT SAME DAY 3 # OF DAYS (INCLUDE SHIPPING TIME FRAME) | ♦ PREVIOUS PROCESSOR: | |

Needless to say, Bjorkman signed these documents and attested to their truth:

* By signing this document below you are agreeing on behalf of the Company to a mandatory binding arbitration provision set forth in the TOS and expressly incorporated herein.
** The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. In addition, by signing this Company Application, you hereby certify that to the best of your knowledge, the information provided about you, the name and address provided for the legal entity customer, and the information provided about the beneficial owner(s) and/or the individual with control over the legal entity customer is complete and accurate.

| SIGNATURE: X [signature] | PRINTED NAME: MARYLOU BJORKMAN | TITLE: OWNER | DATE: 08/10/2018 |
|---|---|---|---|

As set forth above, Evil Angel Jewelry was not a real company. Accordingly, these statements were not half-truths or strategic omissions. Instead, they were blatant and obvious lies about the business and the purpose for which the accounts would be used.

Having opened these accounts through fraud, Bjorkman then helped to funnel dirty money that was the proceeds of child pornography offenses and bank fraud back to the Newstar conspirators. She moved or help move more than $160,000 through

these accounts. Doc. 13 at 28-30. The graphic below illustrates the movement of money from "CyberPay"—the credit-card processing website for the Newstar Websites—through Bjorkman's accounts:

The Cyberpay credit card transaction file included <u>171,945 transactions totaling $7,978,560 from January 11, 2006 to November 6, 2019</u>. **<u>3,077 transactions totaling $161,858 reconciled</u>** from the Cyberpay data file to the merchant account and then to Hope Trans Tech Inc Fifth Third Bank account ending 5161.




Money generated from sales by the Newstar Websites also continually flowed through Bjorkman's accounts during the 15-month period she allowed her accounts to be used to launder money, as illustrated by the following graphic:



Bjorkman's Hope Trans Tech accounts were used to funnel money from more than 3,000 individual transactions on the Newstar Websites by customers from 37 countries.

Bjorkman also held "co-signer" status with M.R.B. on several other bank accounts used by the Newstar Enterprise from 2010 to 2019, which were held at Bank of America, Wells Fargo, and SunTrust Bank. Through those accounts flowed an additional $486,320 directly attributable to proceeds of the Newstar Websites. Another $351,694, though irreconcilable based on information available to the United States, might also represent Newstar Websites revenue flowing through those accounts. Bank accounts held by Bjorkman therefore constituted a cornerstone of the Newstar Enterprise's money laundering operation.

Bjorkman's conduct thus helped sustain and perpetuate the Newstar Enterprise, which profited off the sexual exploitation of children. As noted above, the Newstar Enterprise was a network of individuals (both United States citizens and foreign nationals) as well as associated corporate entities, fraudulently opened payment processing accounts and bank accounts controlled by those individuals, that sourced, ordered, produced, advertised, sold for profit, and distributed child-exploitative content, and then laundered the illicit proceeds. Doc. 13 at 21–25. A general, over-simplified outline of the Newstar Enterprise and its operating structure is illustrated by the above

graphic.




This Enterprise distributed child-exploitative content via the Newstar Websites, which were a collection of websites, hosted on servers in the United States and abroad, that were purportedly dedicated to legal child modeling. But in reality, they were designed to and did advertise, sell, distribute, and otherwise make available child pornography and child erotica depicting the supposed child "models." *Id.*

In general, each Newstar Website was dedicated to a specific brand or line represented by a child-victim. The child-victims depicted on the Newstar Model Collection sites ranged between approximately six to 17-years old. Typically, the child-victim's stage name appeared in each Newstar Model Collection website's name and URL, alongside the words "Newstar," "Tinymodel," or "Sweet." For example, the Newstar Model Collection websites featured lines/brands named "Newstar [C.]," "Sweet [G.]" and "Sweet [L.]." The images for sale on the websites did not depict full

nudity, but a large number of them were highly sexual and depicted the child victims displaying and exhibiting their scantily clad pubic areas.[3] An example of a gallery on one of the Newstar Websites appears below.




---

[3] Federal courts have uniformly held that non-nude content may still constitute chargeable child pornography when it includes a lascivious exhibition of a minor's clothed genitals or pubic area. *See, e.g.*, *United States v. Knox*, 32 F.3d 733, 737 (3d Cir. 1994); *United States v. Williams,* 444 F.3d 1286, 1299 (11th Cir. 2006) ("pictures needn't always be 'dirty' or even nude depictions to qualify" as child pornography), *overturned on other grounds*, 553 U.S. 285 (2008); *United States v. Hunter*, 720 F. Appx. 991, 996 (11th Cir. 2017) ("a photograph can be lascivious even if the child is not naked and the depiction is not 'dirty'"); *United States v. Butler*, -- F. Supp. 3d --, 2021 WL 4553201, at *3 (M.D. Fla. Oct. 5, 2021) (video of 14-year-old wearing two-piece swimsuit included lascivious exhibitions of the minor's clothed genitals or pubic area); *United States v. Price*, 775 F.3d 828, 830, 833 (7th Cir. 2014) ("There is no nudity requirement in the statutory definition of 'sexually explicit conduct,' of which 'lascivious exhibition of the genitals or pubic area' is a part."); *United States v. Helton*, 302 F. Appx. 842, 844 (10th Cir. 2008); *United States v. Villasenor*, 236 F.3d 220, 224 (5th Cir. 2000); *United States v. Carroll*, 190 F.3d 290, 297-98 & n.7 (5th Cir. 1999), *withdrawn and reinstated in part on reh'g*, 227 F.3d 486 (5th Cir. 2000); *United States v. Horn*, 187 F.3d 781, 789-90 (8th Cir. 1999).

Visitors to these websites could preview images and were prompted to subscribe for more content. Multiple subscription plans were offered, most recently priced at $49.99 (34 days), $79.99 (60 days), and $99.99 (90 days). Accepted forms of payment on the Newstar Websites included credit cards and cryptocurrency, although customers predominantly paid with credits cards.

One Newstar Website—Clipmonster.net—was managed by M.R.B. and offered à la carte videos and image sets depicting the victims found on the other Newstar Websites. Clipmonster was commonly connected to the various Newstar Model Collection sites through links and advertising banners. A screenshot of the Clipmonster site appears below.




The Newstar Enterprise existed to make money. For this reason, access to bank accounts and accounts to process credit-card payments was its lifeblood. The Enterprise's principals—including Kenneth Power and M.R.B.—knew that no bank would permit them to open accounts to process customer payments and move money

that ultimately derived from the Newstar Websites. They therefore needed others to open fraudulent accounts to keep the Enterprise running.

By agreeing to defraud financial institutions and allow Power and M.R.B. access to accounts obtained by lies, Bjorkman helped the Enterprise continue functioning—continue having photographers recruit and exploit new "models," continue obtaining new child pornography and erotica, and continue distributing it online for profit. Bjorkman may not have known that the money ultimately derived from child pornography and child exploitation, but she certainly knew that the money was not from Evil Angel Jewelry's sales. Her criminal conduct demonstrates recklessness and a complete lack of concern about exactly what the accounts were being used for, if not Evil Angel's business. A guidelines sentence is thus a just sentence in this case.

**B. History and characteristics of the defendant**

Bjorkman's history and characteristics reveal nothing out of the ordinary that would support a downward departure or variance. Bjorkman is not a defendant with a low IQ or other severe mental, emotional, or social disabilities. Her diagnoses of severe depression, anxiety, and PTSD took place after the offense conduct ended in November 2019. PSR ¶71. While she may have been suffering from these conditions during the offense conduct, they are unfortunately common afflictions and do not explain or excuse her criminal conduct. In addition, nothing in the PSR indicates that Bjorkman struggles with alcohol or drug abuse. PSR ¶73.

The United States' sentencing recommendation accounts for the circumstances of Bjorkman's marriage to her husband, M.R.B. Bjorkman claims to have committed

the offense conduct at M.R.B.'s insistence, and the PSR explains that M.R.B. was physically, emotionally, and sexually abusive and kept his business dealings a secret from her. PSR ¶¶31, 60. Engaging in criminal conduct at the insistence of a trusted spouse may not be fully understandable, but it is a somewhat mitigating factor.

At best, however, the circumstances of Bjorkman's marriage to M.R.B. support a sentence at the bottom of the applicable guidelines range, not one below the low end of the range. While Bjorkman may have suffered during her marriage to M.R.B., the details of their relationship are sadly common, and they are certainly not so unusual as to justify a variance from the guidelines range. In addition, regardless of whether M.R.B. cajoled or recruited her into the criminal scheme, Bjorkman was a mature adult who should have known better. And M.R.B.'s secretiveness about his business should have made Bjorkman more skeptical about committing her offenses, not less.

In sum, Bjorkman's personal history and characteristics ultimately do not weigh in favor of a downward departure or variance.

**C. Seriousness of the Crime, Promoting Respect for the Law, and the Need for Just Punishment and to Avoid Unwarranted Sentencing Disparities**

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring). Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976). Here, the seriousness of the crime, taken with the need for just punishment, the need to avoid unwarranted

sentencing disparities, and the goal of promoting respect for the law, weigh heavily in favor of a guidelines sentence.

1. Promoting respect for the law

This Court's sentence must reflect the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). Bjorkman's conduct illustrates that she has no respect for the integrity of our nation's banks and financial system. She lied outright to financial institutions and deprived them of their ability to know what type of business was using their accounts. She also kept this scheme going for more than a year. This Court's sentence must express an appropriate level of social condemnation of her crimes. A downward variance does not achieve that end.

2. Impact on the victims

This Court's sentence must also consider those victimized by Bjorkman's conduct. As noted above, Bjorkman abused our nation's financial system. Although the financial institutions suffered no identifiable financial losses, Bjorkman's conduct was nonetheless disruptive to their healthy function and undoubtedly exacted indirect costs on their operation. Her conduct also exposed merchant processing companies, their banking partners and other FDIC insured banks to reputational harm by leveraging their services and platforms to help fund the continuing operation of an international child exploitation enterprise. In this regard, Bjorkman's conduct bore resemblance to Newstar co-conspirator Patrice Wilowski-Mevhorah, who Judge Scriven recently

sentenced to 63 months in prison for her role in laundering money for the Newstar Enterprise.[4]

Bjorkman's criminal conduct also, indirectly, perpetuated the victimization of the Newstar Websites' child-victims. Most of the child-victims, recruited by the Newstar Enterprise in Ukraine, Moldova, and other nations in Eastern Europe, were particularly vulnerable due to their age, family dynamics and poverty. Doc. 13 at 25. For roughly 15 years, more than one hundred of these children—often prepubescent and many as young as 6 years old, were exploited by the Newstar Enterprise to produce more than 4.64 million images and videos. *Id.* at 23. The depictions were sold and circulated to customers located in 101 nations across the world. *Id.* at 26. The depictions doubtlessly now circulate in perpetuity. Even today, "Newstar" content is a common feature of child pornographers' collections recovered by law enforcement.

As the Supreme Court has recognized, "[t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children .... [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation..." *See New York v. Ferber*, 458 U.S. 747, 758–59 nn. 9–10 (1982) (citations omitted). A guidelines sentence is necessary to recognize the victims (both identified and unidentified) harmed by Bjorkman's conduct, unknowing though it may have been.

---

[4] In so doing, Judge Scriven found that the PSR properly applied the six-level enhancement under USSG §2S1.1(b)(1)(iii) based on Wilowski-Mevorah's knowledge of the child-exploitative content on the Newstar Websites. *See United States v. Wilowski-Mevorah*, No. 8:21-cr-00206-MSS-TGW, Docs. 39, 40 (M.D. Fla.).

**D. Adequate deterrence and the need to protect the public**

This Court's sentence must also afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). Section 3553(a)'s legislative history demonstrates that Congress viewed deterrence as "particularly important in the area of white-collar crime." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting S.Rep. No. 98–225, at 76 (1983)); *United States v. Livesay*, 525 F.3d 1081, 1094 (11th Cir. 2008). Defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment. *Martin*, 455 F.3d at 1240. Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence." *Id*.

Bjorkman's work for the Newstar Enterprise was premeditated and appears to have been purely motivated by the expectation of money—precisely the type of crime amenable to general deterrence. *See id*. But beyond merely deterring Bjorkman from engaging in future fraud, this Court should also impose a guidelines sentence to send a strong warning to other individuals currently involved in or considering similar conduct. Only a guidelines sentence adequately deters this type of criminal conduct and protects the community.

## IV. Conclusion

For the reasons set forth above, this Court should sentence Bjorkman to the bottom end of the applicable guidelines range.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: */s/ Francis D. Murray*
FRANCIS D. MURRAY
Assistant United States Attorney
Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone: (813) 274-6000
Fax: (813) 274-6103
Email: francis.murray2@usdoj.gov

*/s/Kyle P. Reynolds*
KYLE P. REYNOLDS
Trial Attorney
U.S. Dept. of Justice, Criminal Division
Child Exploitation and Obscenity Section
New York Bar No. 4703856
Authorized to Practice Under L.R. 2.01(a)
1301 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 616-2842
Facsimile: (202) 514-1793
Email: Kyle.Reynolds@usdoj.gov

**U.S. v. Bjorkman** **Case No. 8:21-cr-227-SDM-AAS**

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Bjorn E. Brunvand, Esq.

*/s/ Francis D. Murray*
Francis D. Murray
Assistant United States Attorney
Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone: (813) 274-6000
Fax: (813) 274-6103
Email: francis.murray2@usdoj.gov